## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EDWARD GEORGE CARTER,

      Plaintiff,

v.                                            Case No. 11-15322

CITY OF DETROIT, et al.

      Defendants.

_____/

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In a trial to the bench Plaintiff Edward Carter was convicted of a heinous armed rape which, it appears certain, he did not commit. Although he was facially identified as the perpetrator by the victim, and there were initial indications from independent witnesses (later negated) that he had been seen in the vicinity of the crime, there was no scientific or independent evidence of his guilt. Carter spent decades in prison until Detroit Police officials re-examined certain items of evidence, including latent fingerprints found at the scene of the crime, several on the upper and one on the lower level handicap-assist handrails. The victim had told investigators she had been instructed by the perpetrator to "face [the] wall and hold unto [sic] the bars in the stall...." As to the print on the lower bar, investigators noted that "[b]ecause of their [sic] location it appears that this print could have only been left lifting him or herself from the floor." The original examination of the latent finger and palm prints revealed nothing of apparent significance at the time, except that Carter was not the source of the prints.

In the early 1970s the state of forensic investigation was comparatively primitive—only twenty years had passed since DNA, for example, had first been described by Nobel Laureate James Watson, J.D. Watson & F.H.C. Crick, *Molecular Structure of Nucleic Acids*, 171 NATURE 737-38 (1953), and the ability to identify individuals through DNA was more than a decade off, Alec J. Jeffreys, et. al. *Positive identification of an immigration test-case using human DNA fingerprints,* 317 NATURE 818 (1985).  The FBI developed the first computer-assisted fingerprint databases in 1979, but local law enforcement could not afford to procure such systems until sometime after 1986.  Simon A. Cole, *Automatic Fingerprint Recognition Systems* 18 (2004). Accordingly, it was futile to try to explore other possible identifications without known prints to compare.  There was nothing else to do with the latent prints.

Carter argues that the report of the non-identification was not just an investigatory dead-end, but actually exculpatory, and because it was not revealed to his attorney by the investigators, an actionable constitutional violation occurred. See *Brady v. Maryland,* 373 U.S. 83, 84 (1963).

As it turned out, in 2009, with the help of a modern computer database, investigators identified another man as the contributor of at least some of the latent fingerprints collected at the scene. The newly identified man, it turned out, had a proven history of perpetrating attacks almost exactly like the one of which Carter had been convicted. Eventually, Carter's conviction was vacated, and he was released from prison.

Carter now sues the city of Detroit, and various former officials, under 42 U.S.C. §§ 1983 and 1985. Defendants are the City of Detroit and police officers Susan

2

Siemaszko, William Vitorakos, Steven Dest, Donna Lally, and Russell Morgan. He alleges violations of the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.  Now before the court is Defendants' Motion for Summary Judgment.  (Dkt. # 43.)  Oral argument was held on October 22, 2015.

Defendants argue, in essence, that to find prints in a public place left by someone other than the criminal defendant does not qualify as "exculpatory." In any event, Defendants say, police investigators in 1973 were not yet clearly bound by Brady requirements concerning evidence.

For the reasons explained below, Defendants' Motion for Summary Judgment will be granted.

## I. BACKGROUND

At approximately 3:30 p.m. on October 22, 1974, a twenty-two year old female student at Wayne State University entered a women's restroom in the Analytical Laboratory Chemistry Building on campus.  (Dkt. 43, Pg. ID 229.)  She was attacked by a male assailant who had been hiding behind the restroom door.  (*Id.*)  Brandishing a kitchen knife, the assailant forced the victim into the handicapped stall where he ordered her to turn around and hold onto the handrail bar while he pulled down her pants and underwear.  (*Id.*)  He then forcibly sodomized her—engaging in anal sex and forcing her to perform oral sex on him.  (*Id.*)  He stole the victim's watch, and then fled the premises.  (*Id.*)

After the victim notified law enforcement officials of the assault, the Women and Children Services Section of the Detroit Police Department dispatched evidence technicians to the scene of the crime.  (*Id.*)  A police officer searched and photographed

3

the bathroom stall.  (*Id.*)  In the course dusting for latent prints, the officer sucessfully recovered fingerprints and palm prints from the stall, at least some of which were on a handrail bar.  (*Id.*)  These prints were removed and transported for further analysis.  (*Id.*)  Approximately two weeks later, Defendant police officer Russell Morgan analyzed the latent fingerprints and discovered that they did not match Plaintiff's. (Dkt. # 43-7, Pg. ID 262; Dkt. # 45, Pg. ID 294)

Four days after Defendant Morgan analyzed the latent prints, the Wayne County Prosecutor's office charged Plaintiff with armed robbery, sodomy, and assault with intent to commit gross indecency.  (Dkt. # 43, Pg. ID 230.)  Two months later, he was tried, convicted, and sentenced to life in prison plus seventeen and a half to twenty-two and a half years at a bench trial before Judge Samuel C. Gardner in Detroit Recorder's Court.  (*Id.* at Pg. ID 230.)  Plaintiff appealed his conviction to the Michigan Court of Appeals, which affirmed the lower court's decision.  (Dkt. # 45, Pg. ID 282.)  He then filed *pro se* request for an evidentiary hearing and a request for resentencing in the Wayne County Circuit Court.  (*Id.*)  Both motions were denied.  (*Id.*)

After several more failed attempts to obtain post-conviction relief on his own, Plaintiff contacted The Cooley Law School Innocence Clinic in 2004.  (*Id.*)  The Innocence Project requested review of the semen and seminal fluid collected from the victim, but the evidence could not be found.  (*Id.* at 282-83.)  Nevertheless, a Detroit police officer ran the latent prints taken from the handrail through the FBI's Integrated Automated Fingerprint Identification System, and discovered they matched one Willis Taylor III, a serial sexual predator who had been arrested for four sexual assaults between 1974 and 1978 — two of which took place on Wayne State's campus.  (*Id.* at

4

283.)  Armed with this information, Plaintiff filed a motion for relief from judgment, which was granted.  (*Id.*)  After serving thirty-five years in prison, his conviction was vacated and he was released from custody.  (*Id.*)

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  The movant has the initial burden of showing the absence of a genuine dispute as to a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case."  *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial."  *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).  In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . . credibility judgments and weighing of the evidence are prohibited."  *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

# III. DISCUSSION

## A. Defendant Police Officers: *Brady* Violations

Plaintiff alleges that Defendant police officers violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights by failing to disclose fingerprint and palm print evidence recovered from the scene of the crime in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

*Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

Under current law, police officers bear a "derivative" obligation under the Due Process Clause and *Brady* to disclose exculpatory or impeachment evidence. *Moldowan v. City of Warren,* 578 F.3d 351, 376-81 (6th Cir. 2009).  That duty is discharged when the officer delivers the evidence to the prosecutor's office.  *Id.* at 381.

To prove a true *Brady* violation, the Plaintiff must establish three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued.  *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).

With respect to the first factor, evidence is considered exculpatory "when it is inconsistent with the prosecution's case or tends to support the defendant's case."  *Hunt v. Roberts*, No. 04-3042, 2004 WL 2782578, at *3 (D. Kan. Oct. 26, 2004).  Here, it is unclear whether the fingerprint and palm print evidence would have done either.

6

Viewing the evidence in the light most favorable to Plaintiff, it is *possible* that the evidence *might* have aided his defense, depending on the theories advanced at trial, since it was only after the fingerprints were analyzed with the assistance of modern technology that his conviction was successfully vacated.  (Dkt. # 45, Pg. ID 282-83.) The court has no knowledge of the positions taken by the prosecution or the Plaintiff during trial; for example, there is no indication that there was any allegation that the perpetrator had touched or handled any object other than the knife during the assault.

For reasons such as those, it cannot be determined whether the absence or presence of any particular person's fingerprints on any particular object could have notable significance, including exculpatory value.  Moreover, courts have specifically found that evidence "that others were present in a public location . . . at some point,"  is not exculpatory, even if that public location was the scene of the crime.  *Sosa v. Dretke,* 133 F. App'x 114, 121-22 (5th Cir. 2005) ("[T]he fact that there were many fingerprints lifted from the bank and the putative getaway car that did not match those of Petitioner . . . is not exculpatory evidence."); *see also United States v. Hemmer,* 729 F.2d 10, 14 (1st Cir. 1984) ("Nor was the fingerprint report exculpatory of defendants.  The fact that certain bills traced to the bank did not bear their fingerprints does not necessarily mean that defendants did not touch the bills.").

While the Sixth Circuit has not addressed this issue directly, in *Farrell v. United States,* the prosecution failed to disclose an expanded DNA report that revealed that in addition to the defendant's DNA, the DNA of several other unidentified people was also discovered on a mask used during a robbery.  162 F. App'x. 419, 424 (6th Cir. 2006). The court suggested without deciding that the expanded report was not exculpatory

7

because the fact that "another individual may have worn a mask used in a robbery . . . does not diminish evidence showing that [Defendant] wore the mask." *Id.* If third-party DNA discovered on a private article of clothing kept by a small group of people including the robber is not exculpatory, then third-party fingerprints discovered in a public area is similarly not exculpatory.

In the instant case, the fact that a person other than Plaintiff had been present in a toilet stall in a public restroom, and had placed his or her hands on a rail designed to be grasped by hands, does not preclude Plaintiff's presence, nor even suggest that Plaintiff was not in that stall, or could not have committed the crime alleged. Such evidence is not "exculpatory" because it cannot be said that such evidence is "inconsistent with the prosecution's case or [that it] tends to support the defendant's case."

Moreover, Plaintiff has also failed to produce sufficient evidence for a triable fact as to the second factor of the *Brady* test. Plaintiff argues that there "is no evidence that [the fingerprint and palm print analysis] was ever disclosed to [Plaintiff's] defense attorney." (Dkt. # 45, Pg. ID 290.) While this appears to be true, the argument mischaracterizes a police officer's duty to disclose exculpatory evidence. Unlike prosecutors, "[p]olice officers do not disclose evidence to criminal defendants directly." *Moldowan v. City of Warren,* 578 F.3d 351, 379 (6th Cir. 2009) (quoting *Jean v. Collins,* 221 F.3d 656, 664 (4th Cir. 2000) (en banc)). "Instead, police officers fulfill their *Brady* obligations as long as they inform the prosecutor about evidence that undermine[s] the state's preferred theory of the crime." *D'Ambrosio v. Marino,* 747 F.3d 378 (6th Cir. 2014) (internal citations omitted). Here, Plaintiff points to no evidence that any of the

8

Defendant officers failed to disclose the fingerprint and palm print evidence to the prosecutor prior to trial.

Indeed, Plaintiff flips the burden of proof in *Brady* actions by arguing that *Defendants* have failed to produce evidence that demonstrates that the officers disclosed the evidence to the prosecutors. (Dkt. # 45, Pg. ID 290. But, "[t]he petitioner asserting a *Brady* violation has the burden of establishing the three factors," including that the allegedly exculpatory evidence was, in fact, suppressed. *Bowling v. Parker*, 138 F. Supp. 2d 821, 880 (E.D.Ky. 2001) (citing *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972)). In order to defeat a summary judgment motion, Plaintiff must be able to point to affirmative evidence that suggests that Defendant police officers failed to disclose to the prosecutors the fingerprint and palm print analysis. While at the summary judgment phase of trial, the court views all of the evidence in the light most favorable to the nonmoving party, the nonmoving party still has the obligation to actually produce such evidence. *Copeland v. Machulis,* 57 F.3d 476, 478-79 (6th Cir. 1995) (per curiam). Allegations made in the pleadings alone are insufficient. *Id.* The nonmoving party must marshal enough admissible evidence in support of his complaint that a "jury could reasonably find for" his side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Here, Defendants are correct that Plaintiff has failed to provide *any* evidence of "any individual failure to disclose exculpatory fingerprint evidence." (Dkt. # 43, Pg. ID 228.) None of the prosecutors or Defendant police officers were ever deposed,[1] and

---

[1]Plaintiff, in accordance with the Rule 26(f) scheduling order (Dkt. # 36), did not depose the defendant police officers, file any motions to compel discovery, or seek to extend the discovery deadline prior to May 23, 2013.

none of the interrogatories inquired about whether the police officers turned the evidence over to the prosecutor.  In fact, Plaintiff even admitted in his deposition that, with the exception of Steven Dest, he did not "remember any of the Detroit police officers who were involved in the incident alleged in [his] complaint."  (Dkt. # 43-6, Pg. ID 252.)  Furthermore, discovery failed to generate any evidence that two of the Defendant officers, Susan Siemaszko and William Vitorakos, were involved in the investigation at all.  (*See, e.g.,* Dkt. #45, Pg. ID 331, 339.)

Plaintiff's argument is further complicated by the fact that "*Brady* requires a police officer to disclose evidence to the prosecutor *only* when its exculpatory value is apparent to the officer, that is, when the officer is aware that the evidence could form the basis for exonerating the defendant."  *D'Ambrosio,* 747 F.3d at 389-90 (quoting *Arizona v. Youngblood,* 488 U.S. 51, 58 (1988) (emphasis added)).  The Sixth Circuit has noted that this is the "functional equivalent" of a bad faith test.  *Id.* at 390 (internal quotations omitted).  Because the fingerprint and palm print evidence was not plainly exculpatory, as noted above, the officers cannot have been acting maliciously or in bad faith even if they chose not to disclose it to the prosecutor.  *See Myatt v. United States,* 875 F.2d 8, 12-13 (1st Cir. 1989) ("It is not surprising . . . to learn that fingerprint, palm print, and hair samples retrieved from a busy public place did not match those of [defendants] . . . . We cannot conclude, however, that the evidence suppressed would have raised doubts sufficient to undermine confidence in the outcome.); *Bedard v. McDaniel,* No. 08-0294, 2011 WL 3841228, at *9 (D. Nev. Aug 25, 2011) ("[B]lood and feces in a public restroom, hair in a hairbrush, and fingerprints on a water bottle, are not items that would be unusual or even remarkable in a large business office complex.

10

Thus, the State's decision to not test every surface or preserve every fingerprint does not smack of bad faith.")

The court will grant Defendants' Motion for Summary Judgment with respect to Plaintiff's § 1983 claims against the police officers.

### B. Defendant Police Officers: § 1985 Claim

The record is similarly lacking with respect to Plaintiff's § 1985 claim. To prevail at trial, Plaintiff must prove:

(1) a conspiracy

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws;

(3) and an act in furtherance of the conspiracy

(4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. Of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828-29 (1983). The conspiracy must be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus . . . ." *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971). Plaintiff has provided no evidence to support his allegation of a conspiracy to deprive him of his constitutional rights, let alone that such conspiracy was motivated by racial or class-based animus. In the complete absence of evidence, the court must grant Defendant's Motion for Summary Judgment with respect to Plaintiff's § 1985 claim, too.

### C. Defendant City of Detroit: Municipal Liability

Plaintiff alleges that Defendant City of Detroit should be liable under *Monell*

11

because "Defendants' answers to discovery reflect that there was a total failure to train the officers with regard to their obligation to disclose exculpatory material per *Brady*." (Dkt. 45, Pg. ID 288.)  In *Monell v. New York City Dept. Of Social Servs.,* 436 U.S. 658 (1978), the Supreme Court held that civil rights plaintiffs could sue municipalities under § 1983 if they could show that their injury was caused by a municipal policy or custom. "[T]he failure to provide proper training may fairly be said to represent a policy for which the City is responsible, and for which the City may be liable if it actually causes injury." *City of Canton v. Harris,* 489 U.S. 378, 390 (1989).  To prove this, a plaintiff must demonstrate that the municipality was both aware of the unconstitutional acts of its employees and failed to respond.  *Id.* at 390-91.

Plaintiff has produced no evidence to support the proposition that the city of Detroit failed to train its police officers concerning their *Brady* obligations. Nevertheless, the court does not need to decide this issue.  Plaintiff's failure to provide the court with evidence to support his §§ 1983 and 1985 claims against the officers similarly defeats his claim against the city.  After all, "if a person has suffered no constitutional injury at the hands of the individual police officers, the fact that the" municipality might have failed to train those officers regarding their *Brady* obligations "is quite beside the point." *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (stating that in the absence of constitutional injury, the fact that department's regulation might have authorized the use of unconstitutional excessive force is irrelevant); *D'Ambrosio,* 747 F.3d at 391.  The court will grant Defendants' Motion for Summary Judgment on Plaintiff's claims against the city.

### III. CONCLUSION

The court, of course, sympathizes with Plaintiff's plight as the court hopes any

reasonable person would.  Plaintiff's conviction, and decades of imprisonment, led to a lessening or loss of familial relationships, education or career opportunities, not to mention the kind of reputational impact that followed.

Nevertheless, upon the especially careful review that a case embracing facts such as these deserves, the court concludes that the record simply lacks any indication that Defendants did anything wrong.  (Dkt. #43-6, Pg. ID 254-57.) The technology to match the fingerprint and palm print evidence at issue in this case to Willis Taylor III simply did not exist in 1974.  Even if it did, it is uncertain whether a match would have been produced.  Before the advent of computer aided print-matching, the reasonable reaction of an investigator contemplating the possible value or exculpatory significance of non-matching prints could very well have been, "we only know that someone else was in the stall; that doesn't mean this suspect wasn't."

It is at least fortunate that development in this new technology allowed Plaintiff to clear his name and, one hopes, will make cases of wrongful conviction such as this less likely to occur in the future.

Accordingly, for the reasons set forth above,

IT IS ORDERED that Defendant's Motion for Summary Judgment (Dkt. # 43) is GRANTED.

         s/Robert H. Cleland                    
         ROBERT H. CLELAND
         UNITED STATES DISTRICT JUDGE

Dated:  January 27, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, January 27, 2016, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

accreditation